UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| ASHLEE HUFFMAN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | No. 1:16-CV-00930-TWP-MJD |
| ) | |
| NANCY A. BERRYHILL,[1] ) | |
| ) | |
| Defendant. ) | |

**REPORT AND RECOMMENDATION**

Plaintiff Ashlee Huffman ("Huffman") requests judicial review of the final decision of the Commissioner of the Social Security Administration ("Commissioner") denying her application for Social Security Disability Insurance ("DIB") under Title II and for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("the Act"). *See* 42 U.S.C. §§ 416(i), 423(d), 1382c(a)(3). For the reasons set forth below, the Magistrate Judge recommends that the District Judge **REVERSE** the decision of the Commissioner and **REMAND** the matter for proceedings consistent with this opinion.

**I. Background**

Huffman filed her application for DIB and SSI on April 23, 2009, [Dkt. 13-5 at 9, 12 (R. 232, 235)], alleging April 26, 2008, as the onset date of disability [Dkt 13-5 at 12 (R. 235)]. In her disability report filed in conjunction with her application, Huffman listed attention deficit disorder, dyslexia, back injury, and stage 3 cervical cancer as disabling conditions.[2] [Dkt. 13-6

---

[1] Nancy A. Berryhill is substituted for Carolyn W. Colvin as the nominal defendant pursuant to Federal Rule of Civil Procedure 25(d).
[2] Huffman recited the relevant factual and medical background in her opening brief. [Dkt. 15.] The Commissioner, unless otherwise noted herein, does not dispute these facts. [Dkt. 16.] Because these facts involve Huffman's

1

at 6 (R. 268).] On May 19, 2009, Huffman was determined to be disabled due to mental retardation and affective disorders as of April 26, 2008. [Dkt. 13-4 at 35 (R. 149).] The May 19, 2009 decision, was the last action on Huffman's claim for disability, and is the comparison point decision for purposes of reviewing the instant decision. [Dkt. 13-4 at 35 (R. 149).] At the comparison point decision, it was determined that Huffman met Listing 12.05C and was therefore disabled under the Act. [Dkt. 13-4 at 35 (R. 149).]

On November 30, 2012, the Social Security Administration (SSA) reviewed Huffman's claim for possible medical improvement and ceased benefits when it determined that Huffman was no longer disabled. [Dkt. 13-4 at 14-21 (R. 128-135).] On March 29, 2013, Huffman filed a request for reconsideration with a disability hearing officer. [Dkt 13-4 at 24 (R. 138).] On August 19, 2013, Huffman, represented by counsel, appeared at a hearing before a disability hearing officer. [Dkt. 13-4 at 26 (R. 140).] On September 12, 2013, the disability hearing officer issued a decision finding that Plaintiff was not disabled because she no longer met Listing 12.05C. [Dkt. 13-4 at 37 (R. 151).]

Huffman timely requested a hearing before an administrative law judge, which was held before Administrative Law Judge Terry L. Miller ("ALJ") on June 3, 2014. [Dkt 13-2 at 40 (R. 39).] The ALJ affirmed the cessation of Huffman's benefits in a decision dated September 5, 2014. [Dkt. 13-2 at 30 (R. 29).] On November 2, 2015, the Appeals Council denied Huffman's request to review the ALJ's decision, making it the final decision of the Commissioner for the purposes of judicial review. [Dkt. 13-2 at 2 (R. 1).] Huffman timely filed her Complaint with this Court on April 26, 2016, seeking judicial review of the Commissioner's decision. [Dkt. 1.]

---

confidential and otherwise sensitive medical information, the Court will incorporate by reference the factual background the parties' briefs and articulate specific facts as needed below.

## II. Legal Standard

To be eligible for DIB or SSI, a claimant must have a disability pursuant to 42 U.S.C. § 423. Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

After the SSA determines that a claimant is disabled, it must evaluate the claimant's impairments "from time to time to determine if [the claimant is] still eligible for disability cash benefits." 20 C.F.R. § 404.1589. When evaluating a claimant's continued eligibility for benefits, the SSA must consider whether "there has been any medical improvement in [the claimant's] impairment(s) and, if so, whether this medical improvement is related to [the claimant's] ability to work." 20 C.F.R. § 404.1594. In addition, the SSA must establish "that [the claimant is] currently able to engage in substantial gainful activity before [the SSA] can find that [the claimant is] no longer disabled." *Id.* When the SSA terminates a claimant's benefits, it must examine "all the evidence available in the individual's case file, including new evidence concerning the individual's prior or current condition" and must determine whether "the individual is now able to engage in substantial gainful activity . . . ." 42 U.S.C. § 423(f).

To determine whether a claimant continues to be disabled, the ALJ goes through an eight-step process for the Title II claim, as set forth in 20 C.F.R. § 404.1594(f), and a seven-step process for the Title XVI claim, as set forth in 20 C.F.R. § 416.994(b)(5):

> (1) Is the claimant engaged in substantial gainful activity? If so, the disability has ended. (This factor is not applicable to the Title XVI claim.)
>
> (2) If not, does the claimant have an impairment or combination of impairments which meets or equals the severity of a listed impairment? If so, the disability will be found to continue.

(3) If not, has there been a medical improvement? If so, go to step (4). If not, go to step (5).

(4) Is the medical improvement related to the claimant's ability to do work; i.e., has there been an increase in the claimant's RFC? If not, go to step (5). If so, go to step (6).

(5) If at step (3) there has been no medical improvement, or if at step (4) medical improvement is not related to ability to do work, do any exceptions apply? If [so], then we look to step (6). If an exception from the second group applies, then the disability has ended.

(6) Are the claimant's current impairments severe in combination? If not, the disability has ended.

(7) If so, can the claimant (based on his or her residual functional capacity [determined between steps six and seven]) perform his or her past relevant work? If so, the disability ends.

(8) If not, can the claimant do other work given his or her residual functional capacity, age, education, and work experience? If so, the disability has ended.

*Blake v. Astrue*, No. 1:08-cv-1268-LJM-DML, 2010 WL 679077, at *9 (S.D. Ind. Feb. 22, 2010) (citing *Hannum v. Barnhart*, No. 1:04-cv-01445-DFH-TAB, 2005 WL 1799433 at *5 (S.D. Ind. Jul. 27, 2005)); *see also* 20 C.F.R. § 404.1594(f).

The individual claiming disability bears the burden of proof at steps one through seven. *Whittington v. Colvin*, No. 1:14-cv-01533-RLY-DML, 2016 WL 824858, at *2 (S.D. Ind. Feb. 5, 2016). Only at step eight does the Commissioner bear the burden of showing that the claimant can perform work that exists in significant numbers in the national economy after considering the claimant's age, education, work experience, and functional capacity. *Id.*

The ALJ's findings of fact are conclusive and must be upheld by this Court "so long as substantial evidence supports them and no error of law occurred." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* The Court may not reweigh the

evidence or substitute its judgment for that of the ALJ but may only determine whether substantial evidence supports the ALJ's conclusion. *Overman v. Astrue*, 546 F.2d 456, 462 (7th Cir. 2008) (citing *Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000)); *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007)). The ALJ "need not contain a complete written evaluation of every piece of evidence." *McKinzey v. Astrue*, 641 F.3d 884, 891 (7th Cir. 2011) (quoting *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005)). However, the "ALJ's decision must be based upon consideration of all the relevant evidence." *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1997). To be affirmed, the ALJ must articulate his analysis of the evidence in his decision. The ALJ must "provide some glimpse into his reasoning" and "build an accurate and logical bridge from the evidence to his conclusion." *Dixon*, 270 F.3d at 1176. The scope of review is confined to the rationale offered by the ALJ. *See SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010).

### III. The ALJ's Decision

At step one, the ALJ determined that Huffman had not engaged in substantial gainful activity since November 30, 2012, the date that her benefits ceased. [Dkt. 13-2 at 18 (R. 17).] At step two, the ALJ found that Huffman no longer has an impairment or combination of impairments which meets or equals the severity of a listed impairment. [Dkt. 13-2 at 18 (R. 17).] Specifically, the ALJ concluded that Huffman's adaptive functioning abilities no longer meet the Listing 12.05C criteria. [Dkt. 13-2 at 18 (R. 17).] At step three, the ALJ found that Huffman experienced medical improvement since the initial disability determination. [Dkt. 13-2 at 19 (R. 18).] At step four, the ALJ determined that the medical improvement was related to Huffman's ability to work. [Dkt. 13-2 at 19-20 (R. 18-19).] At step five, the ALJ found that Huffman's endometrial hyperplasia, migraine headaches, obesity, osteoarthritis, anxiety, depression/bipolar

5

disorder, attention deficit hyperactivity disorder, and borderline intellectual functioning constituted severe impairments which caused more than minimal limitations in Huffman's ability to work. [Dkt. 13-2 at 20 (R. 19).]

Between steps six and seven, the ALJ determined that Huffman had the Residual Functional Capacity ("RFC") to perform "light work." [Dkt. 13-2 at 20 (R. 19).] Specifically, the ALJ found the following:

> After careful [sic] of the entire record, undersigned finds that beginning on November 20, 2012, claimant has had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) at 416.976(b) except as reduced by the following. Limitations include only occasional climbing of ramps/stairs, balancing, stooping, kneeling, crouching and crawling, but never climbing ladders, ropes, or scaffolds with need to avoid concentrated exposure to loud noise and bright/flashing lights. Mentally, the claimant cannot understand, remember or carry out detailed or complex job instructions, but remains capable of performing simple, repetitive tasks on a sustained basis (i.e. eight hours a day/ five days a week or equivalent work schedule) with no sudden or unpredictable workplace changes or fast-paced work or work requiring a regimented pace of production. Work would also only require, at most, occasional simple reading/writing/math calculation. Finally, the claimant is limited to only casual/superficial interactions with others including supervisors, co-workers and the general public, which interactions with the general public is [sic] further limited to only occasional interactions, and is best suited to working alone in semi-isolation from others or as part of a small group.

[Dkt. 13-2 at 20-21 (R. 19-20).]

At step seven, the ALJ determined that Huffman could not perform her past relevant work of cashier and pizza cook work since November 30, 2012. [Dkt. 13-2 at 28-29 (R. 27-28).] At step eight, after considering Huffman's age, education, work experience, and RFC, the ALJ found that Huffman could perform several jobs that existed in significant numbers in the national economy [Dkt. 13-2 at 29-30 (R. 28-29).] These jobs included stock checker, wire cutter, and repack room worker. [Dkt. 13-2 at 29-30 (R. 28-29).] Based on these findings, the ALJ concluded that, as of November 30, 2012, Huffman was no longer disabled under the Act.

## IV. Discussion

Huffman makes four arguments as to why the decision of the Commissioner should be reversed. First, Huffman argues that the ALJ erred when he found that Huffman's impairments did not meet Listing 12.05C. Second, Huffman argues that the ALJ erred by failing to rely upon the opinion of a qualified medical expert when determining that Huffman does not medically equal Listing 12.05C. Third, Huffman argues that the ALJ failed to incorporate all limitations in his RFC. Fourth, Huffman argues that the ALJ erred by allowing her to proceed with the hearing without legal representation. The Court addresses each argument in turn.

### A. Listing 12.05C

Huffman first argues that the ALJ relied on isolated portions of the record and failed to build a logical bridge from the evidence to his conclusion that Huffman's impairments do not meet or equal a Listing. [Dkt. 15 at 14-18.] In response, the Commissioner argues that the ALJ properly assessed Huffman's adaptive functioning level when considering whether she continued to meet Listing 12.05C. [Dkt. 16 at 11.]

Listing 12.05C states in relevant part (using the terminology in effect at the time of the ALJ's decision):

> 12.05 *Mental retardation*. Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period, *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied . . .
>
> . . .
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.

20 C.F.R. § 401, Pt. 404, Subpt. P, App. 1 § 12.05C.

Listing 12.05C has three separate requirements: (1) significantly subaverage general intellectual functioning with deficits in adaptive functioning that initially manifested before age 22; (2) a valid IQ score of 60 through 70; and (3) a physical or other mental impairment imposing an additional and significant work-related limitation of function. *Bailey v. Colvin,* No. 1:14-cv-1366-DML-JMS, 2015 WL 5714632, at *4 (S.D. Ind. Sep. 29, 2015). For a claimant to show that her impairment matches a listing, the impairment "must meet *all* of the specified medical criteria" for that listing. *Munoz v. Barnhart*, 47 Fed. App'x 70, 775 (7th Cir. 2002) (quoting *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990)). An impairment that manifests only some of the criteria, no matter the severity of the impairment, does not qualify. *Id.* When a test produces more than one IQ score —such as a verbal, performance, and full scale IQ scores—the Commissioner must consider "the lowest of these in conjunction with 12.05." 20 C.F.R. § 401, Pt. 404, Subpt. P, App. 1 § 12.00D.

In addition to the foregoing, a claimant must also exhibit deficits in adaptive functioning. *Strunk v. Heckler,* 732 F.2d 1357, 1360 (7th Cir. 1984); *see also* 20 C.F.R. § 401, Pt. 404, Subpt. P, App. 1 § 12.00B4. Even though the Seventh Circuit has not imposed a measurement tool for assessing adaptive functioning, it describes deficits in adaptive functioning as the "inability to cope with the challenges of ordinary everyday life." *Novy v. Astrue*, 497 F.3d 708, 710 (7th Cir. 2007). Though the Court must give deference to the ALJ's factual determinations underlying his Listing assessment, the ALJ must consider all of the evidence, particularly the evidence contrary to the determination. *See Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001) (quoting *Henderson v. Apfel*, 179 F.3d 507, 514 (7th Cir. 1999)). ("An ALJ may not ignore an entire line

of evidence that is contrary to her findings," and if conflicting evidence exists, she must explain why the conflicting evidence was overcome by the evidence on which she relied.).

The ALJ referenced medical determinations, consultative exams, and Huffman's own testimony when making his determination that Huffman no longer met Listing 12.05C. In part, the ALJ drew the following factual conclusions:

> Claimant independently attends to personal and self-care needs, **and for a time did so for a seven month old or younger nephew**, and while she alleged occasionally needing prompting to attend to self-care activities, such is unsupported by unkempt observation or evidence of significant memory deficit. Claimant attends to household chores including cooking using both a stove and microwave, watering plants, taking out trash, doing laundry, vacuuming/sweeping, driving, some shopping and she was providing care for a cat. **She also testified to babysitting two to five nephews, which includes one very small child seven months and younger and record notes she appears to have been doing this since September 2013.** Claimant reports having friends, and she reports several other longstanding relationships. Claimant does some shopping, reports she was bicycling, occasionally attends church and goes tanning. Claimant reports listening to music, working puzzles, watching a little TV, sewing, reading, accessing Facebook via her cell-phone, independently handling her own disability benefits, and earlier reported enjoyment in dancing. She also reports ability to pay bills, count change and handle checking/savings accounts.

[Dkt. 13-2 at 20 (internal citations omitted) (emphasis added).]

Huffman argues that the ALJ mischaracterized her testimony that Huffman regularly babysat her nephews.[3] In support, Huffman points to her testimony showing that her "babysitting" actually consisted of watching her nephews while her grandmother remained in the

---

[3] Huffman additionally argues that she is unable to handle money, pointing to her hearing testimony, suggesting that she simply gives cash to her grandmother who actually then handles the nuts and bolts of money management, and the opinion of Dr. Scherbinski, who opined that "[d]ue to her basic mathematical calculation skills being variable but somewhat below average, the claimant does not appear capable of managing any award of benefits independently." [Dkt. 13-8 at 53 (R. 522).] The ALJ supported his determination that Huffman could handle money with citations to multiple reports, including two by Huffman herself, stating that Huffman was able to handle her money. [*E.g.*, Dkt. 13-6 at 21 (R. 283) (function report from Huffman stating that she is able to pay bills, handle savings account, count change, and use a checkbook); Dkt. 13-6 at 57 (R. 319) (function report from mother opining that Huffman is able to pay bills, handle savings account, count change, and use a checkbook).] On remand, however, the ALJ should address Huffman's testimony and Dr. Scherbinski's opinion directly.

house, such that Huffman would hand her nephews to her grandmother every time they screamed and would cry whenever the nephews cried since she had no idea what to do. [Dkt. 13-2 at 77 (R. 76).]

The ALJ placed Huffman's ability to babysit at the center of his determination that Huffman is capable of coping with the challenges of day-to-day life, and thus not disabled under Listing 12.05C. But the undisputed evidence demonstrates that this conclusion is erroneous. Huffman's testimony establishes that she did not engage in "babysitting," as that term is ordinarily understood, but instead merely sat with her nephews while her grandmother remained in the house as the responsible adult, ready to care for the children whenever Huffman herself had a meltdown.

In this case, the ALJ found that Huffman has "medically improved" since the SSA determined she was disabled under Listing 12.05C in 2009. In now concluding that Huffman does not meet Listing 12.05C, the ALJ has failed to explain how Huffman's condition has "medically improved" since the 2009 disability determination, and instead has relied upon inaccurate evidence that Huffman "babysits." In fact, Huffman's actual "babysitting" lends support to her contention that she is **unable** to cope with the challenges of day-to-day life. Remand is thus required so that an ALJ can build a logical bridge from the evidence to a conclusion on Huffman's adaptive functioning.

### B. Expert on Medical Equivalency

Second, Huffman argues that the ALJ improperly failed to obtain an expert's opinion when deciding that Huffman's combination of impairments do not meet or medically equal the severity of Listing 12.05C. [Dkt. 15 at 22-23.] Huffman also argues that the ALJ never cited the state agency opinions or disability forms contained in the record. [Dkt. 15 at 23.]

In response, the Commissioner argues that the ALJ did not need to call a mental health expert to testify at the hearing since the reviewing Disability Determination Services physicians and specialists noted the absence of findings that supported an intellectual disability under Listing 12.05C. [Dkt. 16 at 12-13.] The Commissioner further argues that Huffman has not cited any medical evidence that would support her claim that she meets Listing 12.05C. [Dkt. 16 at 13.]

While the step-three determination of whether a listing is met or equaled is an "ultimate legal question" left to the ALJ and which must be affirmed if supported by substantial evidence, Social Security regulations require the ALJ to consider the opinion of an expert in making the medical equivalency determination. S.S.R. 96-6P, 1996 WL 374180; *Barnett v. Barnhart*, 381 F.3d 664, 670 (7th Cir. 2004) ("Whether a claimant's impairment equals a listing is a medical judgment, and an ALJ must consider an expert's opinion on the issue."); 20 C.F.R. § 404.1526 ("We also consider the opinion given by one or more medical or psychological consultants designated by the Commissioner."). This, at a minimum, requires the ALJ to consider a medical consultant's assessment of the record evidence, usually in the form of a disability determination form. *Barnett*, 381 F.3d at 670.

In this case, the record includes two Disability Determination and Transmittal forms, both of which reflect expert opinions that Huffman does not meet Listing 12.05C. [Dkt. 13-3 at 4-5, 8-9 (R. 110-111, 113-114).] The ALJ also considered the opinions of Dr. Coulter-Kern and Dr. Scherbinski, both authorized by Disability Determination Services to examine the claimant, which concluded that Huffman can take care of herself and is capable of gainful employment. [Dkt. 13-2 at 18-20 (R. 17-19); Dkt. 13-8 at 52-53 (R. 521-522).] The ALJ thus did not fail to consult expert opinions as required to assess medical equivalency at step three.

11

## C. RFC Determination

Third, Huffman argues that the ALJ failed to incorporate in his RFC all limitations suggested by Dr. Scherbinski, despite actually concluding that certain limitations were appropriate. In response, the Commissioner argues that the ALJ adequately supported his RFC determination and accounted for all the limitations suggested by Dr. Scherbinksi. [Dkt. 15-16.]

The RFC is a measure of the most a claimant can do despite the limitations imposed by her impairments. *Wartak v. Colvin*, No. 2:14-CV-401-PRC, 2016 WL 880945, at *5 (citing *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004)). "The RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." SSR 96-8P, 1996 WL 374184, at *3 (July 2, 1996). Relevant evidence includes medical history; medical signs and laboratory findings; the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment; evidence from attempts to work; need for a structured living environment; and work evaluations. *Wartak*, 2016 WL 880945, at *5 (citing SSR 96-8P, 1996 WL 374184, at *5). In arriving at an RFC, the ALJ "must consider all allegations of physical and mental limitations or restrictions and make every reasonable effort to ensure that the file contains sufficient evidence to assess RFC." *Id.* Ultimately an RFC determination must be upheld if it is supported by substantial evidence. *See* SSR 96-8P, 1996 WL 374184, at *3; *Young v. Barnhart*, 362 F.3d 995, 1002 (7th Cir 2004) (finding that RFC was flawed since the ALJ failed to account for all of the claimant's mental impairments and never explained how he reconciled two conflicting limitations).

The ALJ reviewed Dr. Scherbinski's findings as follows: "Examiner noted likely limitation stemming from learning difficulties would be best suited for a position utilizing lower level applied knowledge, repetition and frequent review of job skills, which would provide direct

instruction. **ALJ provides such limitation herein.**" [Dkt. 13-2 at 26 (R. 25) (emphasis added).] The problem, however, is that while the RFC does include limitations to simple, repetitive tasks (among other limitations), nowhere does it articulate any requirement for direct instruction or regular review of job skills. Nor did the ALJ confirm with the vocational expert whether jobs would exist for a person so limited. The Commissioner is correct that the RFC determination is the province of the ALJ and that ordinarily a doctor's opinion does not necessarily mandate a specific accommodation in and of itself. However, here the ALJ expressly stated that he was providing for a limitation as articulated in Dr. Scherbinski's opinion and then failed to do so. Under these circumstances, the Court concludes that remand is required because the ALJ failed to build an accurate and logical bridge between his discussion of the record evidence and his RFC determination.

### D. Lack of Legal Representation

Finally, Huffman argues that the ALJ failed to inform her of the right to counsel at her disability hearing and failed to ensure a valid waiver of counsel. [Dkt. 15 at 18-19.] Huffman further argues that the ALJ failed to develop the record fully and fairly by failing to ask Huffman questions regarding job difficulties, verbal and written reprimands, and other job related disciplinary actions. [Dkt. 15 at 19.]

In response, the Commissioner brings up two alternative arguments. First, the Commissioner argues that the ALJ developed a full and fair record, which negates any problems related to Huffman's valid waiver of counsel. [Dkt. 16 at 16-18.] In the alternative, the Commissioner argues that the SSA complied with the statutory and regulatory requirements for obtaining a valid waiver of representation for Huffman, and that the ALJ "took diligent steps to obtain that waiver." [Dkt. 16 at 18-22.]

13

In reply, Huffman argues that the Commissioner's written notice did not properly advise Huffman of her right to representation since she has difficulty reading. [Dkt. 17 at 1-2.] Further, Huffman again argues that the ALJ did not develop a full and fair record since he failed to question Huffman about her past job duties, failed to ask her whether she had been reprimanded at work, and failed to order additional IQ tests. [Dkt. 17 at 2-4.]

The Court first addresses the waiver issue first, and then addresses whether the ALJ developed a full and fair record.

### 1. *Huffman's waiver of counsel*

Claimants have a statutory right to have representation at disability hearings. 42 U.S.C. § 406; 20 C.F.R. § 404.1700; *Binion v. Shalala*, 13 F.3d 243, 245 (7th Cir. 1994). If properly informed of that right, however, a claimant may waive it. To ensure a valid waiver of counsel, the ALJ must provide "[1] an explanation of the manner on which an attorney can aid in the proceedings, [2] the possibility of free counsel or a contingency arrangement, and [3] the limitation on attorney's fees to twenty-five percent of past-due benefits plus required court approval of fees." *Thompson*, 933 F.2d at 584. The claimant must receive "sufficient information to enable [her] to intelligently decide whether to retain counsel or proceed *pro se.*" *Lucas v. Colvin*, No. 1:15-cv-01870-SEB-MJD, 2017 WL 489771, at *2 (S.D. Ind. Feb. 7, 2017) (quoting *Thompson*, 933 F.2d at 584)). As long as both the ALJ's oral notification and the written notification together sufficiently convey the three requirements from *Thompson*, the information is sufficient to ensure a valid waiver. See *Lucas*, 2017 WL 489771, at *2.

In this case, the SSA mailed Huffman an acknowledgement letter which informed her about various options for obtaining a representative, indicated that there are representatives who worked on a contingency basis and provided free services, and informed Huffman about the

14

potential benefits of a representative and the rules and options governing fees.[4] [Dkt. 13-4 at 51-55 (R. 165-69).] The SSA also attached a list of organizations that provide free legal assistance, as well as a list of phone numbers for referral services that could match her with social security attorneys and non-attorney representatives. [Dkt. 13-4 at 56-58 (R. at 170-172).]

At the hearing in February 2014, the ALJ informed Huffman of her right to counsel, explained the manner in which an attorney can aid in the proceedings, and informed Huffman about the limitation on and required court approval of attorney fees. [Dkt. 13-2 at 100-01 (R. 99-100).] The ALJ explicitly asked Huffman and Huffman's cousin, who was in attendance as a witness, whether they had any questions about representation, and Huffman's cousin in fact asked the ALJ to explain the fee cap. [Dkt. 13-2 at 108 (R. 107)]. The ALJ permitted Huffman to postpone the hearing to allow her time to seek representation. [*Id.*] At the June 2014 hearing, the ALJ referenced the January hearing and asked whether Huffman had been successful in getting a representative. [Dkt. 13-2 at 43 (R. 42).] Huffman responded that she was not successful in getting a representative, and understood that she could only postpone a hearing one time absent special circumstances. [Dkt 13-2 at 43 (R. 42).]

Between the written notice and the ALJ's explanations, Huffman received the three required notices from *Thompson*: (1) the manner in which an attorney can aid in the proceedings, (2) the possibility of free counsel or a contingency arrangement, and (3) the limitation on attorney fees to 25 percent of past due benefits and required court approval of the fees. *Thompson*, 933 F.2d at 584. The ALJ met his obligation to provide Huffman with sufficient information to intelligently decide whether she wished to have representation in this case.

---

[4] While Huffman states that she has limited literacy, the record also reflects that Huffman has relatives who read her mail to her. [Dkt. 13-2 at 48 (R. at 47).]

*2. The ALJ's Record*

Where the disability benefits claimant is unassisted by counsel, the ALJ has a duty to "scrupulously and conscientiously probe into, inquire of and explore for all of the relevant facts." *Tuggle v. Colvin*, No. 1:15-cv-00070-SEB-DKL, 2016 WL 1237369, at *4 (S.D. Ind. Feb. 8, 2016) (quoting *Binion*, 13 F.3d at 245). If the Commissioner meets his burden of proving that the record was developed fully and fairly, the claimant must rebut this showing by demonstrating prejudice or an evidentiary gap. *Binion*, 13 F.3d at 245. Prejudice may be demonstrated by showing that the ALJ "failed to elicit all of the relevant information from the claimant." *Id.*, citing *Smith*, 587 F.2d at 860; *Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000) (ALJ failed to develop full and fair record and prejudiced claimant when he relied on ten-year-old X-rays and failed to consider relevant hypertension-induced dizziness); *Binion*, 13 F.3d at 245 (ALJ fully and fairly developed the record since he obtained all the medical and treatment records, probed into all the relevant areas at the hearing, and made sure to question the claimant about the medical evidence in the file, her medication, pain, daily activities, and physical ability to perform a number of activities). This requires the claimant to present "specific [and relevant] facts that were not brought out during the hearing." *Binion*, 13 F.3d at 246.

In this situation, the ALJ obtained and analyzed all of Huffman's psychological evaluations, Disability Determination Services examinations, and medical and treatment records from the plaintiff's treating physicians. [Dkt. 13-2 at 18-20 (R. 17-19).] The ALJ also questioned Huffman about her physical and mental impairments, symptoms and limitations, daily activities, medication, education, and work history. [Dkt. 13-2 at 44-68 (R. 43-67).]

Huffman argues that the ALJ failed to ask her about her job duties and whether she had any difficulties at her past jobs. [Dkt. 17 at 3.] Furthermore, Huffman argues that the ALJ should

16

have asked Huffman whether she had received any verbal reprimands, written reprimands, suspensions, or any other type of discipline while she was working. [Dkt. 17 at 3.] Finally, Huffman argues that the ALJ should have asked for additional examinations since the most recent IQ test was performed in 2009. [Dkt. 17 at 4.] But Huffman does not explain how these various lines of inquiry would have produced relevant evidence tending to demonstrate disability. Huffman only offers conjecture or speculation that further questions might have perhaps helped her cause without explaining the evidence that these the questions would have elicited. This is not sufficient to demonstrate reversible error.

The ALJ's approach in this case, however, is still concerning at several points. For example (though not raised by Huffman) the ALJ elicited testimony from Huffman that she suffers from vision problems at night due to scar tissue on her "peripheral vision." [Dkt. 13-2 at 46 (R. 45).] The ALJ asked no further questions about Huffman's vision. But in his decision, the ALJ was quick to discredit Huffman's complaints of vision difficulties as unsupported by medical records. [Dkt. 13-2 at 21 (R. 20).] As the ALJ had Huffman's records at the time of the hearing, the ALJ should have noticed that Huffman's complaint of vision problems was not reflected in the records and thus should have inquired further. For example, the ALJ should have asked when the issue arose and whether Huffman had sought treatment for it. The Court reminds the ALJ of his obligation to fully develop the record when faced with unrepresented claimants.

## V. Conclusion

For the aforementioned reasons, the Court should find that substantial evidence does not support the ALJ's determination that Huffman is not disabled. The District Judge should therefore **REVERSE** and **REMAND** the matter to the Social Security Administration for further proceedings.

Any objections to the Magistrate Judge's Report and Recommendation shall be filed with the Clerk in accordance with 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure 72(b), and failure to timely file objections within fourteen days after service shall constitute a waiver of subsequent review absent a showing of good cause for such failure.

Dated: 19 JUN 2017

Mark J. Dinsmore
United States Magistrate Judge
Southern District of Indiana

Distribution:

Service will be made electronically
on all ECF-registered counsel of record via
email generated by the court's ECF system.